(333 P.3d 921)
No. 110,533

VERONICA RIBEAU, *Appellant*, v. RUSSELL STOVER CANDIES and TRAVELERS INDEMNITY CO. OF AMERICA, *Appellees*.

Opinion filed August 29, 2014.

*William L. Phalen* and *Crystal D. Marietta*, of Pittsburg, for appellant.

*Brenden W. Webb*, of Hoffmeister, Doherty & Webb, LLC, of Overland Park, for appellees.

Before STANDRIDGE, P.J., PIERRON, J., and JOHNSON, S.J.

PIERRON, J.: Veronica Ribeau appeals the order of the Workers Compensation Board (Board) denying her claim for compensation for an alleged peanut and nut allergy arising out of and in the course of her employment at Russell Stover Candies (RSC). Ribeau argues the Board erred in finding she had failed to prove the existence of the peanut and nut allergy and failed to establish a causal connection between the allergy and her work at RSC. Ribeau also argues that RSC should be estopped from denying the existence of her work-related allergy where it terminated her employment at RSC due to the allergy. We affirm.

Ribeau is a 50-year-old woman with a high school education and no specialized vocational training. She worked as a cook and service worker for about 4½ years at RSC's candy manufacturing plant in Iola, Kansas. Ribeau testified that as part of her job duties, she worked with peanuts and nuts. She denied that she had any food allergies before she began working at RSC. She claims she began developing symptoms after she was accidentally sprayed in the face with what she believed to be a combination of metrin (soybean-based) oil and peanut oil, which was used to lubricate belts and trays at the plant. Ribeau stated that after she was sprayed in the face, she experienced symptoms such as dizziness, lightheadedness, headache, and burning of her eyes, nose, and mouth. She reported the accident to a supervisor and was told to use the eye wash station. The plant nurse gave her Benadryl and told her lie down for

a while. Ribeau left work early that day. She returned to work the next day.

Ribeau testified that from the date of the accident around December 2006 until she was terminated from her employment at RSC on December 8, 2008, she experienced symptoms such as dizziness, lightheadedness, headache, rash, and vomiting on days she worked with nuts. Ribeau reported these symptoms to her supervisors and the plant nurse, who told her to take ibuprofen and Benadryl and to make sure she got off the plant floor if nauseated. She estimated that she vomited at work at least 30 to 40 times. Ribeau stated she began treatment with her family doctor, who told her to take Benadryl and carry an epi-pen in case she had a bad reaction. Ribeau reported this treatment to RSC but allegedly continued to work with nuts and continued to experience symptoms.

Ribeau moved to a different town and changed family doctors to Dr. Amy Madril. Dr. Madril testified that some time after October 2008, her office received a phone call from somebody stating that Ribeau had been sent home from work at RSC because she had a reaction working with cashews. The caller asked for a referral to an allergy specialist. Dr. Madril's office records do not indicate whether the call was made by Ribeau, RSC, or someone else. Dr. Madril made a referral to Dr. Michael Baker, an ear/nose/throat doctor who practiced allergy medicine.

Dr. Baker testified he saw Ribeau on December 2, 2008, and took her medical history. Ribeau told Dr. Baker she had been sprayed in the face with a combination of metrin oil and peanut oil and thereafter began having increased reactions to peanuts and nuts. Over the past 2 years, Ribeau was no longer able to eat peanut butter because it caused her throat and chest to tighten and swell. Based on Ribeau's self-reported medical history of reactions after exposure to peanuts and nuts, most recently a reaction 2 weeks earlier while working on the pecan and cashew line at RSC, Dr. Baker diagnosed Ribeau with a peanut and nut allergy. By history, Dr. Baker also diagnosed Ribeau with recurrent angioedema (swelling). Based on Dr. Baker's findings, Dr. Madril agreed with the peanut and nut diagnosis.

Also based on Ribeau's self-reported history, Dr. Baker believed her peanut and nut allergy had been caused by her exposure to peanuts and nuts during her work at RSC. Dr. Baker explained that susceptible individuals can develop allergies if exposed to an allergen over a period of time. As to causation for a newly-developed allergy, Dr. Baker explained generally that the only way to determine causation was to examine a patient's history of exposures and reactions. He acknowledged it was possible that Ribeau developed her allergies due in part to exposure to peanuts and nuts at places other than RSC. Dr. Madril agreed there was no way to determine causation of a newly-developed allergy except for the timing of symptom development. However, she did not give a specific opinion as to whether Ribeau's work at RSC caused the allergies.

In addition to taking Ribeau's medical history, Dr. Baker performed a physical examination, and the results were normal. Dr. Baker also performed a blood test to screen for the six most common food allergies—milk, eggs, wheat, soy, corn, and peanut. The results of the blood test were normal, but Dr. Baker stated that a false negative was possible and that Ribeau's self-reported medical history still indicated a peanut and nut allergy.

Dr. Baker was contacted by an RSC representative concerning Ribeau's allergies and possible accommodations that RSC could make. Dr. Baker told RSC that Ribeau needed to avoid peanuts and nuts, but RSC stated there was nut dust in the plant and that it would be impossible for Ribeau to avoid all contact with nuts even if she wore a protective mask and gloves. Dr. Baker later learned Ribeau was terminated from her job at RSC on December 8, 2008, due to RSC's inability to accommodate her peanut and nut restrictions.

In January 2009, Ribeau went to Dr. Pedro Murati for an independent medical evaluation. Based on Ribeau's self-reported medical history, Dr. Murati diagnosed her with a peanut allergy. Dr. Murati also performed a physical examination and found Ribeau had facial puritis, although he did not specifically find the puritis to be allergy-related. Dr. Murati concluded within a reasonable degree of medical probability that Ribeau's allergy was a

direct result of working with peanuts and nuts at RSC. He recommended Ribeau avoid peanut products and receive a full evaluation from an allergist.

In June 2009, Ribeau saw Dr. Daniel Stechschulte, an allergist at the University of Kansas Medical Center. According to his reports, Dr. Stechschulte performed skin tests on Ribeau for common allergies, including peanuts and walnuts, but all results were negative. He recommended further blood testing for possible peanut and nut allergies, testing for sensitivity to metrin oil, and testing for other possible causes of the swelling and other symptoms Ribeau was experiencing. The additional blood tests for peanut and nut allergies were performed and came back negative. Dr. Stechschulte died in July 2011 and did not testify about his evaluation of Ribeau.

In late 2009, Dr. Stechschulte arranged a hypersensitivity skin test for Ribeau's reaction to metrin oil, with follow-up to be performed by Dr. Madril. At the first follow-up appointment, Ribeau complained she was itchy and irritated all over, not necessarily just around the skin test patches. Dr. Madril noted no obvious skin reaction at the test sites. Three days later, at the second follow-up appointment, Ribeau complained of headache, weakness, nausea, vomiting, and general malaise. Dr. Madril again noted no obvious skin reaction at the test sites but gave Ribeau a steroid injection in case she was having a more generalized reaction to the allergy testing. Dr. Madril stated that on both dates there was no objective indication of allergic reaction, but Ribeau's subjective complaints indicated possible allergic reaction.

Sometime in 2010, Dr. Murati recommended Ribeau seek desensitization treatment for her peanut and nut allergy. In July 2011, Ribeau was sent to Dr. John Martinez, an allergist at the University of Kansas Medical Center who had taken over responsibility for some of Dr. Stechschulte's patients. Martinez testified the focus of the appointment was Ribeau's wish to receive desensitization treatment for her peanut and nut allergy and her desire for testing to prove a metrin allergy. Dr. Martinez informed Ribeau such desensitization treatment was not clinically available and there was no standardized test for metrin allergy. Dr. Martinez also performed

a physical exam and diagnosed Ribeau with swelling and hives, but he gave no opinion as to whether those symptoms were allergic reactions. He nonetheless recommended she continue to avoid peanut and nut products. Martinez explained that even though there was no proof Ribeau was truly allergic to peanuts and nuts, she believed she was reacting to them and thus it was appropriate for her to avoid those products.

In August 2011, Ribeau went for a second appointment with Dr. Murati to obtain an impairment rating. Dr. Murati noted that Ribeau's June 2009 tests for peanut and nut allergies were negative but Ribeau reported considerable difference in symptom frequency since eliminating those foods from her diet. Dr. Murati performed a physical examination of Ribeau and found normal results. He placed a work restriction on Ribeau to avoid peanuts and nuts. Dr. Murati reaffirmed his original diagnosis of peanut and nut allergy based on Ribeau's self-reported medical history and found within a reasonable degree of medical probability that Ribeau's allergy was a direct result of her work with peanuts and nuts at RSC. Dr. Murati stated his causation determination was based on the fact Ribeau was exposed to peanuts and nuts at RSC and thereafter began developing symptoms. On cross-examination, Dr. Murati acknowledged Ribeau could have been exposed to peanuts and nuts anywhere, not just through her work at RSC.

Based on the diagnosis of peanut and nut allergy, Dr. Murati found that Ribeau sustained a 5% whole person impairment according to the AMA Guides to the Evaluation of Permanent Impairment, p. 280, table 2 (4th ed. 1993) (skin disorders). On cross-examination, Dr. Murati acknowledged that the Guides did not specifically cover allergies.

Ribeau met with two different vocational specialists for a task and wage analysis. Karen Terrill identified 34 essential job tasks performed by Ribeau, 15 of which she could not perform under the peanut and nut restriction, for a 44% task loss. Since Ribeau was not working, she suffered a 100% wage loss. Based on Terrill's report, Dr. Murati agreed that Ribeau had a 44% task loss due to the peanut and nut restriction.

Steve Benjamin identified 38 essential job tasks performed by Ribeau, 7 of which she could not perform under the applicable restriction, for an 18.4% task loss. Ribeau was not working and thus suffered a 100% wage loss. However, Benjamin believed Ribeau could reenter the labor market at an entry level wage. If so, Ribeau would suffer a 23.4% wage loss from her earnings at RSC.

Ribeau testified that after she was terminated from RSC, she had been unable to find work that did not involve contact with peanut or nut products. She stated she took precautions to avoid such products in her daily life by reading the labels on everything she ate and all cleaning and personal products she used. Despite these precautions, she continued to experience allergic reactions one to four times per week, which were severe enough to interfere with her daily life. Ribeau denied she had these allergy symptoms before she began working at RSC and coming into constant physical contact with peanuts and nuts. She acknowledged she had contact with peanut and nut products at places other than RSC before her accident around December 2006. She also acknowledged she continued to have contact with those products at places other than RSC after the accident and after she was terminated from her employment at RSC.

Ribeau submitted a claim for workers compensation to the administrative law judge (ALJ), arguing she had developed a peanut and nut allergy out of and in the course of her employment at RSC and had been unable to work since her termination at RSC. She contended she was eligible for 72% work disability based on a 44% task loss and 100% wage loss. RSC argued Ribeau had failed to prove the existence of an injury because all objective testing for peanut and nut allergies was negative. Furthermore, Dr. Madril, Dr. Baker, and Dr. Murati's diagnoses of peanut and nut allergy were based solely on Ribeau's self-reported medical history and not on any contemporaneous medical evidence that Ribeau was suffering an allergic reaction to peanuts or nuts. RSC also argued the doctors' determinations that Ribeau's alleged allergy was caused by her exposure to peanuts and nuts at RSC was factually unsupported and logically flawed.

The ALJ denied Ribeau's claim. The ALJ found Ribeau had failed to prove the existence of a true allergy to peanuts, nuts, or metrin oil and had failed to prove the required causal connection between her alleged allergy and her work at RSC. The ALJ noted that all objective tests were negative for peanut, nut, and metrin allergy, and no doctor who had examined Ribeau ever documented a physical reaction to peanut or nut products. The doctors who diagnosed Ribeau with an allergy did so based solely on Ribeau's self-reported, uncorroborated history of exposures and reactions. Thus, the doctors had no factual basis for their diagnoses of peanut and nut allergy. Likewise, there was no evidence in the record of the quantity or quality of Ribeau's exposure to peanuts and nuts at RSC and no basis for the doctors' conclusion that Ribeau's purported allergy was caused by exposure at RSC.

Ribeau appealed the ALJ's decision to the Board, which affirmed the decision and adopted the ALJ's analysis in its entirety. The Board found particularly persuasive that no doctor who examined or treated Ribeau ever documented a physical reaction to her alleged peanut and nut allergy. Furthermore, no doctor related Ribeau's ailments to the 2006 exposure to metrin oil or diagnosed Ribeau as having a metrin oil allergy. The Board acknowledged that while physical findings of an allergic reaction are not necessary to meet the definition of "injury" under the Workers Compensation Act, "there needs to be some evidence that [Ribeau's] allergy actually exists. This record, absent [Ribeau's] allegations, contains no such evidence."

Ribeau timely petitioned this court for judicial review of the Board's decision.

We first turn to the question of whether the Board erred in finding Ribeau had failed to prove an injury arising out of and in the course of her employment at RSC. We find no error in the Board's decision.

Appellate review of a Workers Compensation Board's decision is governed by the Kansas Judicial Review Act (KJRA), K.S.A. 2013 Supp. 77-601 et seq.; K.S.A. 2013 Supp. 44-556(a); K.S.A. 2013 Supp. 77-603(a). The scope of judicial review is limited by K.S.A. 2013 Supp. 77-621. An appellate court may review the Board's legal

conclusions and may conduct limited review of the Board's factual findings. K.S.A. 2013 Supp. 77-621(c)(4),(c)(7), and (d).

The statute at the heart of this case is K.S.A. 2008 Supp. 44-501(a). It provides in relevant part:

> "If in any employment to which the workers compensation act applies, personal injury by accident arising out of and in the course of employment is caused to an employee, the employer shall be liable to pay compensation to the employee in accordance with the provisions of the workers compensation act. In proceedings under the workers compensation act, the burden of proof shall be on the claimant to establish the claimant's right to an award of compensation and to prove the various conditions on which the claimant's right depends."

In other words, a claimant seeking compensation under the Workers Compensation Act has the burden to prove, as a factual matter, that (1) he or she was injured; and (2) there was a causal connection between the claimant's injury and his or her employment, both as to the nature and timing of the injury. See *Rinke v. Bank of America*, 282 Kan. 746, 752, 148 P.3d 553 (2006) (injury arises "out of" employment if it arises out of the nature, conditions, obligations, and incidents of the employment, and "in the course of" employment if it happened while the claimant was at work in the employer's service); K.S.A. 2008 Supp. 44-508(e) (injury is not deemed to have been directly caused by the employment where the employee suffers disability as a result of the natural aging process or by the normal activities of day-to-day living).

Ribeau argues the Board erred in finding she had failed to prove the existence of her peanut and nut allergy and had failed to establish a causal connection between the allergy and her work at RSC. As to the existence of the allergy, Ribeau points to her own testimony that she suffered immediate adverse reactions after being sprayed in the face with metrin/peanut oil. She claims RSC never disputed the existence of her subsequent allergic reactions and even terminated her because she could not perform her job duties due to the reactions. She also claims patient history is the "gold standard" for allergy diagnosis. Thus, the doctors' diagnoses of peanut and nut allergy based on her self-reported history are reliable evidence of the existence of the allergy, notwithstanding that none of the doctors ever noted a physical symptom linked to

allergy and all objective testing came back negative. As to causation, Ribeau argues it is medically accepted practice to determine causation based on a patient's history. Thus, the doctors' testimonies that her allergy was caused by her work at RSC is persuasive.

RSC argues the Board correctly found Ribeau had failed to prove the existence of a peanut and nut allergy and failed to establish a causal connection between the alleged allergy and her work at RSC. As to the existence of the allergy, RSC denies Ribeau's assertion that her history of exposure and reactions is uncontroverted. RSC argues the only evidence of Ribeau's purported reactions is her own testimony and self-serving statements to doctors. RSC points out that none of the doctors who treated or examined Ribeau ever documented an objective physical reaction attributable to her alleged peanut and nut allergy. RSC also emphasizes that all objective testing came back negative.

As to causation, RSC contends there is no evidence in the record as to the quantity and quality of Ribeau's exposure at RSC. Furthermore, Ribeau admitted she had contact with peanuts and nuts at places other than RSC. Thus, she failed to prove her alleged allergy was caused by her employment at RSC rather than her admitted frequent exposure to peanuts and nuts at other places during the course of her lifetime. RSC also claims the doctors' causation determinations are not reliable because those determinations are based on the *post hoc ergo propter hoc* (after this, therefore because of this) logical fallacy. Finally, RSC argues in the alternative that even if Ribeau suffered an injury from her exposure to peanuts and nuts at RSC, the injury is temporary in nature and not a ratable condition. Therefore, Ribeau is not entitled to an award of work disability, permanent partial disability, or permanent total disability.

An appellate court reviews a challenge to the Board's factual findings in light of the record as a whole to determine whether the findings are supported to the appropriate standard of proof by substantial evidence. See K.S.A. 2013 Supp. 77-621(c)(7). Although not statutorily defined, "substantial evidence" refers to such evidence as a reasonable person might accept as being·sufficient to support a conclusion. *Herrera-Gallegos v. H & H Delivery Service,*

*Inc.*, 42 Kan. App. 2d 360, 363, 212 P.3d 239 (2009). " '[I]n light of the record as a whole' " is statutorily defined as meaning:

"[T]he adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 2013 Supp. 77-621(d).

Under this standard of review, we must determine whether the evidence supporting the Board's decision has been so undermined by cross-examination or other evidence that it is insufficient to support the agency's conclusion. *Herrera-Gallegos*, 42 Kan. App. 2d at 363.

When reviewing the record as a whole, there is substantial evidence supporting the Board's factual finding that Ribeau failed to prove the existence of an injury, *i.e.*, a peanut and nut allergy. All of the objective testing performed—the blood test administered by Dr. Baker in December 2008, the skin tests and blood tests administered by Dr. Stechschulte in June 2009, and the skin test administered by Dr. Madril in December 2009—came back negative for allergy to peanuts, nuts, metrin oil, or any other allergy. Furthermore, none of the doctors who treated or examined Ribeau noted a physical reaction present at the time of treatment or evaluation that was determined to be an allergic reaction. Dr. Baker stated his diagnosis of recurrent angioedema (swelling) was based on Ribeau's self-reported history, not her present physical condition at the time of the exam. Dr. Murati did diagnose Ribeau with facial puritis based on a physical examination, but he never specifically found the puritis was allergy-related. Dr. Madril did not note any physical allergic reactions during the skin test for sensitivity to metrin oil, although she gave Ribeau a steroid shot based on her subjective complaints. Finally, although Martinez performed a physical examination and diagnosed Ribeau with swelling and

hives, he gave no opinion as to whether those symptoms were allergic reactions.

On the other hand, Dr. Baker, Dr. Madril, and Dr. Murati all diagnosed Ribeau with a peanut and nut allergy based on her self-reported history of exposures and reactions. However, there is nothing in the record to corroborate Ribeau's history except her own testimony. It is notable that although Ribeau testified she regularly got sick at work, including rash and vomiting, and reported these symptoms to her supervisors and the plant nurse, the record contains no testimony from her supervisors or the plant nurse. Although RSC apparently terminated Ribeau because it could not accommodate the peanut and nut restrictions that Dr. Baker advised, the record contains no information as to whether RSC actually acknowledged the existence Ribeau's allergic reactions or whether it was merely taking precautions to avoid liability in case Ribeau did have an allergy. In these circumstances, the evidence detracting from the Board's finding Ribeau had failed to prove the existence of an injury does not so undermine the evidence supporting its finding that the Board's conclusion must be reversed.

Turning to the Board's factual finding that Ribeau failed to prove a causal connection between the alleged allergy and her work at RSC, the record as a whole supports this conclusion. Ribeau admitted she had been exposed to peanuts and nuts outside of RSC throughout the course of her life. Furthermore, the record contains no evidence about the quantity and quality of Ribeau's exposure at RSC, aside from generic statements that there was nut dust in the plant and one comment by someone at RSC that Ribeau could not totally avoid exposure to peanuts and nuts even by wearing a protective mask and gloves.

In summary, the Board's factual findings that Ribeau failed to prove the existence of an injury and failed to prove a causal connection between her alleged injury and her work are supported by substantial competent evidence. Thus, the Board did not err in concluding Ribeau had failed to prove a compensable injury under the Workers Compensation Act.

We next consider the question of whether RSC should be equitably estopped or quasi-estopped from denying the existence of

Ribeau's alleged work-related allergy where it terminated her employment at RSC due to the alleged allergy. We find no basis for the application of equitable estoppel or quasi-estoppel.

Ribeau argues for the first time on appeal that RSC should be equitably estopped or quasi-estopped from denying the existence of her peanut and nut allergy, arising out of and in the course of her employment at RSC, where RSC terminated her employment due to the allergy. Ribeau contends it is inequitable for RSC to claim for purposes of unemployment and wrongful discharge that she has an allergy that cannot be accommodated, and yet deny for purposes of workers compensation that she has a work-related allergy. Ribeau asks us to find she did in fact sustain a work-related injury and remand to the Board with instructions consistent with that finding.

RSC contends that Ribeau's estoppel argument is fatally flawed for at least two reasons. First, it denies it ever took the position that Ribeau had a work-related injury. While not conceding that Ribeau in fact has a peanut and nut allergy, RSC argues its decision to terminate her employment was a reasonable, responsible precaution in light of the working conditions in the plant and the statement by Dr. Baker that Ribeau should avoid contact with peanuts and nuts. Furthermore, RSC has always denied any causal connection between Ribeau's alleged allergy and her work at RSC. Second, RSC contends Ribeau has failed to adequately explain how the doctrine of equitable estoppel applies to this situation. RSC specifically argues Ribeau has failed to show how she detrimentally relied on any acts or omissions by RSC.

Since Ribeau fails to explain why this issue should be considered for the first time on appeal, we could decline to consider the issue. See Supreme Court Rule 6.02(a)(5) (2013 Kan. Ct. R. Annot. 39); *State v. Breeden,* 297 Kan. 567, 574, 304 P.3d 660 (2013). However, we will address the issue in case of review.

Ribeau fails to explain how she was induced by RSC's acts or omissions to believe certain facts or how she detrimentally relied on those acts or omissions. Thus, she has abandoned her equitable estoppel argument. See *Chelf v. State,* 46 Kan. App. 2d 522, 535, 263 P.3d 852 (2011) (reciting elements of equitable estoppel);

*Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013) (argument raised incidentally in a brief and not argued therein is deemed abandoned).

Finally, if we consider Ribeau's quasi-estoppel argument on the merits, she must show it would be unconscionable for RSC to maintain a position (*i.e.*, that Ribeau does not have a work-related injury) that is inconsistent with its previous position. See *Chelf*, 46 Kan. App. 2d at 536 (stating that quasi-estoppel involves an assertion of rights inconsistent with past conduct, silence by those who ought to speak, or situations in which it would be unconscionable to permit a person to maintain a position inconsistent with that person's previous position). But as RSC points out, its present position is not inconsistent with its previous position. Ribeau does not cite any evidence in the record showing that RSC ever agreed she has a peanut and nut allergy.

RSC's decision to terminate Ribeau's employment based on the peanut and nut restriction advised by Dr. Baker can easily be understood as a prudent decision. The decision was not necessarily tantamount to an agreement that Ribeau in fact has an allergy. Ribeau cites no evidence that RSC ever conceded a causal connection between her alleged allergy and her work at RSC. Thus, Ribeau's quasi-estoppel argument fails.

For the reason cited above, we affirm the Board's decision to deny the claim for workers compensation.

Affirmed.